IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF WEST VIRGINIA

BETHANY COLLEGE,

    Plaintiff,

v.                                       Civil Action No. 5:14CV139
                                                    (STAMP)

UNITED STATES OF AMERICA,

    Defendant.

**MEMORANDUM OPINION AND ORDER**
**GRANTING IN PART AND DENYING IN PART**
**DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

This case arose from the collision of "sexting,"[1] extortion, embezzlement, drugs, and most importantly, the administrative forfeiture of illicit funds under 21 U.S.C. § 881 and 19 U.S.C. §§ 1602-1619. In the aftermath, Bethany College ("Bethany") found that one of its employee's had stolen over $800,000.00 to pay extortionists. In an unrelated drug investigation, the Drug Enforcement Administration ("DEA") seized from those extortionists $262,020.00, which it administratively forfeited. Bethany now seeks to vacate that forfeiture, under 18 U.S.C. § 983(e), arguing that the Currency was part of the funds embezzled by its employee to pay the extortionists, and thus belongs to Bethany. The government filed a motion for summary judgment. For the following

---

[1] Sexting is "the sending of sexually explicit photos, images, text messages, or e-mails by using a cell phone or other mobile device." Sexting, Dictionary.com, http://dictionary.reference.com/browse/sexting (last visited Nov. 16, 2015).

reasons, this Court grants in part and denies in part the government's motion for summary judgment.

I. Background

A. The Embezzlement and Extortion Schemes

Shelly Lough ("Lough") was a cashier in the business office of Bethany College. In July 2011, Lough and Jason Weese began a "sexting" relationship, involving in the exchange of sexually explicit text messages and photos. ECF No. 23 Ex. 1 at 13. That December, the relationship took a turn. Id. at 57. Jason and his wife, Rachaelle, began threatening Lough with the exposure of her explicit messages and photos unless she paid them. Id. at 13, 15, 239. They told Lough that they would send the messages and photos to her husband, family, employer, and other authorities. Id. at 13, 239. Then the threats became violent. Id. at 57. The Weeses told Lough that they knew where she lived and what vehicles her children drove. Id. The Weeses threatened to burn Lough's house down and to harm her husband. Id. As the threats escalated, so too did the amount of money the Weeses demanded. Id. at 57-58. In total, Lough embezzled $837,398.52 from Bethany to pay the Weeses. Id. at 110, 182.

The Weeses' extortion scheme and Lough's embezzlement continued. Then, in August 2013, Bethany noticed accounting discrepancies amounting to $500,000.00. Id. at 13. Bethany interviewed Lough, and she admitted that she had embezzled money

2

and that she paid all of it to the Weeses. Id. at 218, 222. Bethany reported the embezzlement to the police and conducted an in-depth audit, finding that over $800,000.00 was missing. Id. at 218. After investigating the matter, the police interviewed Lough, and she confessed, telling the police that she did it to pay the Weeses' extortionate demands. Id. at 226. The police turned over to the Federal Bureau of Investigation the extortion portion of the investigation. Id. at 241.

In March 2014, Lough plead guilty to embezzlement. Id. at 6-9. That June, Jason Weese plead guilty to conspiracy to commit extortion and aiding and abetting money laundering, id. at 31-37, and Rachaelle Weese pleaded guilty to conspiracy to commit extortion. Id. at 114-120.

B.  The Drug Investigation

Before the Weeses' extortion scheme was uncovered, the DEA began investigating Jason and Rachaelle Weese in October 2012. ECF No. 22 Ex. 2 at 1-2. The DEA suspected that the Weeses were operating a marijuana "grow house" in their residence in East Liverpool, Ohio. Id. at 3-4. Officers obtained a search warrant for the house and executed the search on March 19, 2013. Id. The officers did not find a grow operation, but did find marijuana distribution paraphernalia. Id. at 4, 13; ECF No. 23 Ex. 1 at 228. The officers also searched the Weeses' safe, finding 169 grams of marijuana and $262,020.00 in United States currency ("the

3

Currency"). ECF No. 22 Ex. 2 at 4, 13. The officers seized the Currency and determined that it was the proceeds of the Weeses' drug activities. Id. at 5.

C. The Forfeited Currency

WesBanco supplied Bethany's money, which came in stacks of $50.00 bills wrapped in WesBanco bands that were initialed and dated by the bank teller who packaged them. ECF No. 23 Ex. 1 at 58. Lough had access to those and smaller bills. Rachaelle testified in her deposition that Lough delivered cash in various denominations, and that in some instances those bills came wrapped in WesBanco bands. Id. at 195. At one point, Jason took a picture of a fan of $50.00 bills with a WesBanco band next to them and posted that picture on Rachaelle's Facebook page. Id. at 14, 232, 243-44. The officer who investigated the extortion, spoke with a WesBanco teller, and she confirmed that the WesBanco band in the picture had her initials on it and that the money pictured was issued to Bethany. Id. at 232, 240. Each of the Weeses' plea agreements and criminal judgments included a statement that the Currency belonged to Bethany. Id. at 31-37, 112, 114-120, 184.

When the DEA seized the Currency, it consisted mostly of $10.00 and $20.00 bills in rubber-banded stacks. ECF No. 22 Ex. 2 at 5, 14, 15. The officer who found the Currency stated that there were no bank bands on any of the Currency and that he found no bank bands in the residence. Id. at 5-6. The officers questioned the

4

Weeses about the source of the Currency, and they each gave varied accounts of the Currency's "legitimate" sources. Id. at 4-5. Rachaelle told the officers that the Currency consisted of hers and Jason's legitimately earned money and money that Jason borrowed from his mother, Penny Weese. Id. Jason said that he inherited the Currency from his grandmother. Id. The officers interviewed Penny Weese, and she said she had not loaned Jason that much money, that he had not received his inheritance, and that she believed the Currency was from drug sales. Id. at 6.

On April 8, 2013, the DEA sent written notice of the Currency's forfeiture to the Weeses and Jason Weese's mother. Id. at 2-3. It also published notice on www.forfeiture.gov for thirty consecutive days beginning on May 21, 2013. Id. at 3-4. The last day to file a claim to the Currency was June 21, 2013. Id. at 4. The declaration of forfeiture was issued on August 20, 2013. Id. at 5, 24.

On May 15, 2014, Bethany sent a letter to the DEA requesting information regarding the Currency. Id. at 25. The DEA responded that the Currency had already been forfeited and disposed of, and that the last day to file a claim was June 21, 2013. Id. at 27. That December, the DEA disbursed the Currency to itself and local law enforcement agencies according to its final decision on equitable sharing issued on November 18, 2013. ECF No. 23 Ex. 1 at

253-55. Bethany then filed this action on October 22, 2014, to vacate the declaration of forfeiture under 18 U.S.C. § 983(e).

## II. Applicable Law

Under Federal Rule of Civil Procedure 56, this Court must grant a party's motion for summary judgment if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is "material" if it might affect the outcome of the case. Anderson v. Liberty Lobby, 477 U.S. 242, 248 (1986). A dispute of material fact is "genuine" if the evidence "is such that a reasonable jury could return a verdict for the non-moving party." Id. If the nonmoving party "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial," summary judgment must be granted against the plaintiff. Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). In reviewing the supported underlying facts, all inferences must be viewed in the light most favorable to the party opposing the motion. See Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986).

The party seeking summary judgment bears the initial burden of showing the absence of any genuine issues of material fact. See Celotex, 477 U.S. at 322-23. "The burden then shifts to the nonmoving party to come forward with facts sufficient to create a triable issue of fact." Temkin v. Frederick County Comm'rs, 945

F.2d 716, 718 (4th Cir. 1991), cert. denied, 502 U.S. 1095 (1992). However, "a party opposing a properly supported motion for summary judgment may not rest upon the mere allegations or denials of his pleading, but . . . must set forth specific facts showing that there is a genuine issue for trial." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 256 (1986).

III. Discussion

The federal government may seize money "furnished . . . in exchange for a controlled substance" and "all proceeds traceable to such an exchange." 21 U.S.C. § 881(a)(6). To forfeit property that is worth $500,000.00 or less, the government must comply with the notice procedures set forth in 19 U.S.C. §§ 1607-1609. 18 U.S.C. § 981(d); 21 U.S.C. § 881(b). Section 1607(a) requires the government to send "written notice of the seizure together with information on the applicable procedures . . . to each party who appears to have an interest in the seized article," and to publish notice for "at least three successive weeks." 19 U.S.C. § 1607(a). If no claims are filed within 20 days from the date of the first publication of the notice, the government may enter a declaration of administrative forfeiture having "the same force and effect as a final decree and order of forfeiture in a judicial forfeiture proceeding." 19 U.S.C. § 1609.

Section 983(e) of Title 18 provides the exclusive remedy for persons seeking to vacate a declaration of administrative

forfeiture.  18 U.S.C. § 983(e)(5).  The court must vacate the forfeiture if: (1) the plaintiff was "entitled to written notice" of the forfeiture; (2) the plaintiff did "not receive such notice"; (3) the government "knew, or reasonably should have known" of the plaintiff's interest; (4) the government "failed to take reasonable steps to provide [the plaintiff] with notice"; and (5) the plaintiff "did not know or have reason to know of the seizure within sufficient time to file a timely claim."  Id. § 983(e)(1).

The parties do not dispute that Bethany did not receive written notice of the forfeiture.  Rather, the government argues that there is insufficient evidence to find that Bethany was entitled to written notice or that the government reasonably should have known of Bethany's interest in the Currency.

A.   Bethany's Entitlement to Written Notice

A person is entitled to written notice of the forfeiture if they "appear[] to have an interest in the seized article."  19 U.S.C. § 1607(a).  Bethany claims that the Currency was embezzled by Lough to pay the Weeses.  The government argues that there is insufficient evidence to show that the Currency was the proceeds of the extortion and embezzlement schemes.

First, the government argues that Bethany's complaint admits the Currency was indicative of drug money.  The complaint describes drug proceeds as typically being in "small bills, i.e., $5's, $10's, and $20's."  ECF No. 1 at 4.  The government notes that the

8

Currency consisted of smaller bills in rubber-banded stacks, indicating that the Currency was drug proceeds. ECF No. 22 Ex. 2 at 5, 14, 15. However, Bethany was permitted to, and indeed did, submit evidence in opposition to the motion for summary judgment rather than relying only on the allegations in its complaint. See Fed. R. Civ. P. 56(c)(1) (requiring a party asserting that a fact is genuinely disputed to "support the assertion by[] citing to particular parts of the material record").

To that end, Bethany submitted enough evidence for a reasonable jury to find that the Currency belonged to Bethany. Lough confessed to giving the embezzled funds to the Weeses. ECF No. 23 Ex. 1 at 218, 222, 226. Some of Lough's payments were in smaller bills while other payments were in larger bills wrapped in WesBanco bands. Id. at 195. Jason Weese posted a picture of crisp $50.00 bills on Rachaelle Weese's Facebook page with a WesBanco band later identified by the issuing bank teller as being issued to Bethany. Id. at 14, 232, 240, 243-44. Jason and Rachaelle Weese admitted that the Currency came from the proceeds of their extortion. Id. at 31-37, 112, 114-20, 184. Further, the Weeses concealed the true source of the Currency from the DEA in the course of its investigation. ECF No. 22 Ex. 2 at 4-5. Based on this evidence, a reasonable jury could certainly conclude that the Currency came from the proceeds of the Weeses' extortion and

9

Lough's embezzlement from Bethany. Thus, a reasonable jury could find that Bethany had an interest in the Currency.

Second, the government argues that the Weeses' plea agreements are not credible evidence that the Currency belongs to Bethany. The Weeses were ordered to pay over $800,000.00 to Bethany in restitution, ECF No. 23 Ex. 1 at 110, 182, and it was in their best interests to have the Currency partially satisfy their restitution obligations rather than having to pay the full sum out of pocket. However, this Court may not properly consider the credibility of evidence on summary judgment. <u>Gray v. Spillman</u>, 925 F.2d 90, 95 (4th Cir. 1991). Moreover, all inferences must be viewed in the light most favorable to the party opposing the motion. <u>See Matsushita Elec. Indus.</u>, 475 U.S. at 587. Therefore, this Court must take the Weeses' plea agreements at face value. The evidence Bethany submitted supports a finding that the Currency belongs to Bethany, and this Court denies the government's motion for summary judgment as to this issue.

B. <u>Whether the DEA Knew or Should Have Known of Bethany's Interest in the Currency</u>

First, the government argues that the DEA did not have actual knowledge of Bethany's interest in the Currency. Bethany does not contest this fact and did not submit any evidence supporting a finding that the DEA had actual knowledge of its interest in the Currency. As such, this Court grants the government's motion for

summary judgment on the issue of the DEA's actual knowledge of Bethany's interest in the Currency.

Second, there is a genuine issue of material fact regarding whether the DEA reasonably should have known of Bethany's interest in the Currency. This issue revolves around whether the DEA adequately investigated the source of the Currency before seeking forfeiture. Bethany argues that the DEA failed to continue investigating the source of the Currency after it became apparent that the money could not have come only from drug proceeds. The government argues that it would never have found out about Bethany's interest through a continued investigation into the Currency's source.

Specifically, Bethany argues that the DEA's investigation did not support its conclusion that the Currency was the proceeds of drug sales. Bethany argues that, based on the relatively small amount of marijuana found, it is unlikely that the Weeses had accumulated over $260,000.00 from street-level drug dealing. Further, the DEA looked at Jason's Facebook page, but did not look at Rachaelle's, which would have revealed a picture of $50.00 bills with a WesBanco band, later identified as having been issued to Bethany. Instead, Bethany argues, the DEA focused its investigation almost entirely on Jason and unjustifiably assumed that the Currency was the proceeds of the Weeses' drug dealing.

The government argues that this Court should not second guess the DEA's investigation of the Weeses' drug activities. Further, it argues that this Court should not impart the investigators' knowledge gained during the extortion investigation upon the DEA, which finished its investigation months before Lough confessed to the embezzlement. It asserts that no evidence known by the DEA would have led it to investigate Bethany's interest in the Currency. It argues that it had no reason to look at Rachaelle's Facebook page and, even if it did, the photo of the Currency would not have reasonably led the DEA to believe that the Currency belonged to Bethany.

The record shows that, despite investigating the Weeses for indoor marijuana cultivation, the DEA's search of their home turned up no evidence of marijuana cultivation. ECF No. 22 Ex. 2 at 1-4, 3-4, 13. Instead, the DEA found large amounts of marijuana and distribution paraphernalia, indicating that the Weeses were engaged in street-level drug sales. Id. at 4, 13. When questioned, the Weeses gave differing accounts about the Currency's "legitimate" sources. Id. at 4-5. Penny Weese told the police that she did not lend that much money to the Weeses and that Jason had not received an inheritance. Id. The DEA searched Jason Weese's Facebook page, but not Rachaelle's. Id. at 5. Then, the DEA ended its investigation into the Currency's source and began forfeiture proceedings.

Viewing the record in Bethany's best light, this Court concludes that a reasonable jury could find that the DEA should have known, based on its investigation, that the Currency was not the proceeds from the Weeses' drug sales. Further, a reasonable jury could find that a continued investigation into the Currency's source could have revealed that it belonged to Bethany. Therefore, this Court finds that there is a genuine issue of material fact as to whether the DEA reasonably should have known of Bethany's interest in the Currency, and this Court denies the government's motion for summary judgment as to this issue.

## IV. Conclusion

For the foregoing reasons, the defendant's motion for summary judgment is GRANTED IN PART and DENIED IN PART. This Court grants summary judgment for the defendant on the issue of whether the DEA had actual knowledge of Bethany College's interest in the Currency, and under Rule 56(g) that fact shall be treated as established in this case. The defendant's motion for summary judgment for all other issues is denied.

IT IS SO ORDERED.

The Clerk is DIRECTED to transmit a copy of this memorandum opinion and order to counsel of record herein.

DATED:      November 19, 2015

                                    /s/ Frederick P. Stamp, Jr.
                                    FREDERICK P. STAMP, JR.
                                    UNITED STATES DISTRICT JUDGE